UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF            )
A Sony Ericsson Xperia cellular phone with    )
SIM card, CB511TNJV8; an Apple iPad        )
(black), DMPMW9PCF4YF; an Apple iPad      )
(white), DMPJN71TF187; an Olympus digital )
camera with memory card, UPQ015030; an    )
HTC AU provider cellular phone with SIM    )
card, SHTBC06190; an Office Depot brand    )
CD-RW labeled "March 10, 2013 DV           )
Incident"; a Brother Work Smart printer,     )
U63535G4F148160.                          )

**Affidavit in Support of a Search Warrant**

I, Special Agent Zachary A. McCarter, being duly sworn state as follows:

**Introduction**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—seven electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am Special Agent (SA) Zachary A. McCarter with the U.S. Air Force Office of Special Investigations (AFOSI) and am assigned to the 7th Field Investigations Squadron, located at Joint Base Andrews (JBA), Maryland. I have been employed at AFOSI as a Special Agent since March 2011. I graduated from the U.S. Air Force Academy, Colorado Springs, Colorado in May 2010 with a Bachelor's of Science in Political Science. I am a graduate of the Criminal Investigator Training Program, the AFOSI Basic Criminal Investigators Course, and the AFOSI Advanced Criminal Investigations Course at the Federal Law Enforcement Training Center at Glynco, Georgia. My responsibilities as a Special Agent include investigating major criminal violations of military personnel and civilians working for or contracted by the U.S. Air Force. I have been in my current supervisory position since January 2014 and currently supervise 12 special agents responsible for investigating sexual assaults, drug violations, deaths, and crimes against persons, property, and society involving the Air Force in the National Capital Region.

3. I present this affidavit in support of a search warrant for the real effects described as: One (1) Sony Ericsson Xperia cellular phone with subscriber identification module (SIM) card enclosed; One (1) Apple iPad (black); One (1) Apple iPad (white); One (1) Olympus digital camera with memory card; One (1) HTC AU provider cellular phone with SIM card; One (1) Office Depot brand compact disc-rewritable (CD-RW); and One (1) Brother Work Smart printer, as more fully described in attachment A. The above items were obtained via consent search from an active-duty USAF member occupying a government housing unit at Misawa Air Base. I seek authority to search these effects for evidence and

instrumentalities related to the confessed crimes of Jacqueline Numata (NUMATA) of communicating two (2) bomb threats to a U.S. military installation, and on two (2) known occasions, deliberately downloading, possessing, and transmitting child pornography, in violation of 18 USC § 844(e), § 875(c), and § 2252A(a)(2)(A) and (B).

    4.   I have not included every fact I know about NUMATA and her illegal activities in this affidavit; rather, I have included those facts I believe are necessary to demonstrate probable cause for the warrant I seek.  The information in this affidavit is based on my personal knowledge and observations, on information conveyed to me by other law enforcement officials, and on my review of records, documents, and other physical evidence related to NUMATA's activities.

**Pertinent Statutes**

    5.   Based on my training and experience, and my discussions with attorneys from the Department of Justice, I have learned that Title 18, United States Code, Section 844(e) makes it illegal to use an instrument of interstate or foreign commerce to convey a false bomb threat.  Specifically § 844(e) provides:

> (e) Whoever, through the use of the mail, telephone, telegraph, or other instrument of interstate or foreign commerce, or in or affecting interstate or foreign commerce, willfully makes any threat, or maliciously conveys false information knowing the same to be false, concerning an attempt or alleged attempt being made, or to be made, to kill, injure, or intimidate any individual or unlawfully to damage or destroy any building, vehicle, or other real or personal property by means of fire or an explosive shall be imprisoned for not more than 10 years or fined under this title, or both.

I am also aware that Title 18, United States Code Section 875(c) makes it illegal to use interstate or foreign commerce to threaten another person.  Specifically, § 875(c) provides:

> (c) Whoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both.

Finally, I am aware that Title 18, United States Code, Section 2252A(a)(2)(A) and (B) make it illegal to download or distribute child pornography.  Specifically, § 2252A(a)(2)(A) and (B) provide:

> (a)  Any person who—
>
> (2) knowingly receives or distributes--
> (A) any child pornography that has been mailed, or using any means or facility of interstate or foreign commerce shipped or transported in or affecting interstate or foreign commerce by any means, including by computer; or
>
> (B) any material that contains child pornography that has been mailed, or using any means or facility of interstate or foreign commerce shipped or transported in or affecting interstate or foreign commerce by any means, including by computer;
>
> … shall be punished as provided in subsection (b).

2

**Identification of the Devices to be Examined**

6. The property to be searched are the following devices:

- One (1) Sony Ericsson Xperia cellular phone with subscriber identification module (SIM) card enclosed, serial number CB511TNJV8;
- One (1) Apple iPad (black), serial number DMPMW9PCF4YF;
- One (1) Apple iPad (white), serial number DMPJN71TF187;
- One (1) Olympus digital camera with memory card, serial number UPQ015030;
- One (1) HTC AU provider cellular phone with SIM card, serial number SHTBC06190;
- One (1) Office Depot brand compact disc-rewritable (CD-RW) labeled "March 10, 2013 DV Incident";
- One (1) Brother Work Smart printer, serial number U63535G4F148160.

**Jurisdiction and Venue**

7. NUMATA is a U.S. citizen and U.S. government non-appropriated funds employee assigned at Misawa Air Base (MAB), Japan, specifically working under the Army and Air Force Exchange Service at Burger King on MAB. NUMATA falls under the U.S. Status of Forces Agreement with Japan while working at MAB, and as such is subject to the Military Extraterritorial Jurisdiction Act. While at MAB, NUMATA temporarily resided at government quarters Unit 1850-D on MAB. NUMATA resided at that address unofficially, but with the expressed permission from USAF Senior Airman Juan Gonzalez and his wife, Delandra Johnson, the official occupants of that address. This residence and the occupants of that residence fall under the jurisdiction of the Military Magistrate at MAB; however, the occupant provided consent for a search of the residence at 1850-D, which allowed for the subsequent collection of any evidence considered to be fruits and instrumentalities of the previously mentioned violations.

**Probable Cause**

8. On January 19, 2015, AFOSI Det 623 received information from Aomori Prefectural Police Department, Misawa Police Station (MPS), Misawa City, Japan, that a bomb threat directed at MAB was emailed to the Misawa City International Center (MCIC), Misawa City, Japan, and forwarded to MPS. The translation of the threat was, "I am Takashi Numata in Misawa City. Tomorrow I will explode Misawa Air Base at 2200. Die Americans [sic]!" Takashi Numata was identified as NUMATA's husband, a Japanese national. AFOSI Det 623 agents worked through the MAB Communications Squadron to identify the source of the threat. It was determined that an IP masking domain address was used to send the email, which was traced to Europe.

9. On January 25, 2015, MAB Security Forces law enforcement desk, contacted AFOSI Det 623 and reported the existence of a web link containing child pornography on "Misawa Asks," the group Facebook site for the MAB community. The Facebook post was made by "Jessica Martin," and stated that she recently moved to Misawa City from Tokyo with her husband. She did not have a telephone or vehicle, but thought that she should post the link so someone could report it to the authorities. SA Kevin McCray, AFOSI Det 623, MAB, JP used a law enforcement computer, specially designated to access contraband sites for investigative purposes, to view the contents of the link. The link went to a website hosting service called "FC2." This website identified T. Numata as the page owner and had an address and telephone number listed as well. There were approximately 150 to 200 graphic images of child pornography. The images depicted prepubescent children engaged in various sexual acts with adults in the majority of the content.

10. SA Talferd Collins, AFOSI Det 623, attempted to get Martin to make an official report with AFOSI and SA Collins offered to go to Martin's residence to obtain the information, being considerate of the fact that Martin said she did not have a car and had young children. SA Collins communicated with Martin through private messaging on Facebook while the link to the child pornography was still up. Martin ultimately told SA Collins she was unable to meet him during the evening of January 25, 2015, but made arrangements to meet SA Collins on January 26, 2015 at 2:00 p.m., at McDonald's in Misawa City, Japan. Agents were posted 360 degrees around the McDonald's, in addition to SA Collins being inside the restaurant; Martin did not show up.

11. On January 26, 2015, SA McCray met with MPS officers and obtained information on NUMATA and T. Numata. The officers had a well-documented case file cataloguing physical abuse and drug allegations by NUMATA against T. Numata. The report disclosed that the couple's two-year-old biological daughter was placed in an orphanage by NUMATA during a custody battle between NUMATA and T. Numata. MPS officers did not believe T. Numata was behind the incidents bearing his name and they reported they regularly drove by his home to check on him. In September/October 2014 during the couple's custody battles, MPS officers captured NUMATA on closed-circuit surveillance footage, breaking into her former residence where T. Numata lived, and taking several items from the home, including an Apple iPad. The surveillance cameras were put in place by MPS after T. Numata reported that NUMATA attempted to set fire to the house.

12. On March 7, 2015, MAB Security Forces law enforcement desk contacted SA Alper Gokten, AFOSI Det 623, and reported the presence of child pornography on a Facebook group called Misawa Asks. The Facebook post was made by "Simmy Richardson," and offered to sell child pornography and provided T. Numata's name and contact information. The Facebook post contained an image that was composed of a collage of child pornography and looked to be an advertisement poster. The poster image also contained a photograph of marijuana and had an offer to sell marijuana in addition to child pornography.

13. On March 9, 2015, MPS officers contacted AFOSI Det 623 and reported that multiple persons in the local community outside of MAB had found papers advertising the sale of child pornography and drugs. MPS officers had several copies of the advertisement and stated that it had child pornographic photographs on it and claimed to be from T. Numata. The description of the flyer by the local police matched the March 7, 2015, posting on Misawa Asks. Several locations in the Misawa community were specified to have had these flyers present; one was a Japanese elementary school. Agents reviewed the actual flyer which also had "i.works" on a banner at the top of the page.

14. On March 11, 2015, agents interviewed T. Numata and he denied having anything to do with all of the incidents in question. T. Numata was unaware of any of the incidents except the one on March 9, 2015, described above. T. Numata was made aware of the flyers containing child pornography by his friend "Lee," who T. Numata did not wish to fully identify. Lee found one of the flyers and brought it to T. Numata's attention. T. Numata disclosed that he had not had access to Facebook since October 2014, when NUMATA stole his iPad from his residence. T. Numata stated he had also changed his email address after NUMATA stole his iPad from his residence. T. Numata was unable to access his old email account because NUMATA had changed the password to his accounts without his knowledge. T. Numata consented to having his media devices imaged to exclude himself as a suspect in the investigation.

15. On March 16, 2015, the MAB Public Affairs office and the MCIC received a bomb threat via email. The threat stated, "This is Numata Takashi of Misawa. I am ban from base, but I come on in back of friend's car. I put 20 bombs on base. At all 3 schools, BX, Burger king, post office, daycare and other place. Each bomb go off at 3pm. Many people die. No American base in Japan! If you contact police, they believe me! I say I deny all, and I do not go to jail! American fucker die! [sic]" As a result of this

threat, all facilities and areas within the affected perimeter zone of the buildings listed above were evacuated. Traffic patterns were changed and security postures at MAB were increased.

16. On March 16, 2015, this affiant interviewed USAF Senior Airman Juan Gonzalez, who was identified through investigative efforts, as being someone who may be able to shed light on the living arrangements of NUMATA. Gonzalez explained that NUMATA was friends with his wife, Delandra Johnson and that NUMATA had been staying at his residence at unit 1850-D on MAB since September 2014. Gonzalez reported that NUMATA normally stayed there when she worked a late shift at Burger King and had to open the next morning. When she stayed at his residence, she stayed in the spare bedroom which also contained Johnson's clothing and other items belonging to Gonzalez and Johnson. Gonzalez said that NUMATA did not have much in the way of personal belongings but did have a small, carry-on sized suitcase. He also stated that NUMATA had a cellular phone and iPad which he witnessed her using on numerous occasions. Gonzalez confirmed that NUMATA had access to his wireless internet server and also used his printer which was accessible on the wireless internet server.

17. Approximately a week or two prior to this interview, Gonzalez noticed that his color printer ink was low and he knew that neither he, nor Johnson had used the printer for color printing enough to cause the ink to be low. Gonzalez said NUMATA usually messaged him through Facebook or in rare cases, texted to his cellular phone when she wanted to stay at his residence. At those times, Gonzalez would leave his front door unlocked so NUMATA could let herself in. At no time did NUMATA have a key to Gonzalez' residence, nor did she have access to Gonzalez' laptop computer which was password protected. Johnson was in Tokyo at the time of the bomb threat and Gonzalez' AFOSI interview because she frequently had modeling jobs there. Gonzalez provided verbal and written consent for a search of his cellular phone used for communications with NUMATA, a search of his residence for any items in his home that did not belong to him or Johnson, and were presumably NUMATA's, and for his printer which was believed to have been used to produce the flyers based upon the information Gonzalez shared.

18. On March 16, 2015, due to the lack of information surrounding the aforementioned incidents, and having no credible supporting information or evidence that T. Numata was behind these incidents, AFOSI Det 623 determined it was critically important to talk with NUMATA as a key witness. Since the first bomb threat incident, SA Collins had made several attempts through cellular phone text messages and Facebook email messages to speak with NUMATA. NUMATA either made appointments to come into the office and speak with agents that she subsequently did not show up for or made excuses why she could not do so. Due to the specific nature of the bomb threat and the heightened security posture of the base, agents felt it prudent to ascertain key details of NUMATA's knowledge of the situation(s) and her communication and relationship with T. Numata.

19. On March 16, 2015, a non-custodial interview of NUMATA was conducted by SA McCray, and NUMATA verbally provided the following: From 2014 to the present (date of this affidavit), NUMATA and T. Numata were engaged in divorce and custody proceedings. In order to increase the likelihood of a favorable outcome and to seek retribution for the alleged physical abuse T. Numata inflicted on NUMATA, she researched ways to falsely incriminate T. Numata.

20. In January 2015, using her Apple brand iPad tablet device, NUMATA utilized The Onion Router (TOR) website/software to mask her internet protocol (IP) address and accessed an anonymous email website. NUMATA crafted an email to the MCIC, wherein she claimed to be T. Numata. In the email, NUMATA stated T. Numata would bomb MAB the following night. NUMATA stated she created this bomb threat to prevent T. Numata from winning custody of their daughter in the ongoing divorce and custody proceedings.

21. NUMATA further stated that later in January 2015, she accessed a child pornography site

called "Play Pen," which had multiple images of child pornography on the page. NUMATA downloaded several dozen child images which appeared to depict children engaged in sexual acts. NUMATA accessed the website FC2.com to create a blog, and used T. Numata's name in creating the page. NUMATA uploaded multiple images of children engaged in sex acts to the page. Later, NUMATA created a false Facebook page under the name of Jessica Martin, and using this account, NUMATA posted the link to the aforementioned blog onto the Misawa Asks Facebook community page. NUMATA utilized the alias Jessica Martin, and while doing so, claimed she stumbled upon the blog randomly and wanted to report this child pornography to the proper authorities. NUMATA was familiar with FC2 because she had used the site several years prior, under her true name. NUMATA stated she took the above actions to prevent T. Numata from winning custody of their daughter in the ongoing divorce and custody proceedings. NUMATA completed these actions utilizing her iPad.

22. In March 2015, NUMATA again accessed the website known as "Play Pen" to download images of child pornography. In this instance, NUMATA created a flyer, advertising the sale of children for sex, child pornography, and marijuana. NUMATA attached several images of child pornography from "Play Pen" to the flyer. NUMATA put T. Numata's name on the flyer, along with his contact information. NUMATA then printed approximately 50 copies of this flyer and distributed them in public places and at private residences throughout Misawa City, Japan. NUMATA stated she threw the envelopes out of her car as she drove throughout Misawa City. She explained that the effort took approximately three hours to complete. Additionally, NUMATA took a photograph of the flyer and posted that photograph to the Misawa Asks community page, using the alias "Simmy Richardson." NUMATA admitted to using Gonzalez' printer to produce the 50 copies of the flyer, prior to placing them in envelopes and distributing them.

23. On March 16, 2015, after NUMATA saw no adverse actions against T. Numata, NUMATA again accessed an anonymous email website and sent an email to several MAB organizations/offices, threatening to bomb the schools, hospital, and several other highly populated buildings on base. NUMATA signed the email with T. Numata's name in order to draw negative law enforcement attention to T. Numata. NUMATA stated that all of the electronic devices which she utilized to complete the aforementioned actions were located at Gonzalez' residence, unit 1850-D on MAB.

24. On March 16, 2015, a search of Gonzalez' residence, unit 1850-D yielded several items of evidentiary value, specifically identified in attachment A. The search was executed based upon consent from Gonzalez, concurrently while NUMATA was being interviewed by this affiant. The devices were located in a common area/bedroom that both he and Johnson used, in addition to NUMATA. Furthermore, NUMATA's entry into the residence was always predicated upon her seeking permission from Gonzalez and/or Johnson to stay at the residence.

25. While the items listed above were seized based on consent and legal advice, the items have not been searched. The items listed in Attachment A are currently in storage at AFOSI Det 623, Building 1012, MAB, JP. In my training and experience, I know that these devices have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the devices first came into the possession of AFOSI.

26. Based on NUMATA's admissions and corroborating evidence, I believe there is probable cause that the items listed in Attachment A were used to facilitate criminal activity. Specifically, NUMATA has admitted that all of the items used to communicate the false bomb threats and to download, copy, and disseminate the child pornography were located in Gonzalez's residence. There is probable cause to believe that at least one of the iPads was used to access the internet to download the child pornography, to create a fake Facebook account, to create a fake email address, and to email the false bomb threat and the child pornography. There is also probable cause to believe that one of the iPads

was the iPad stolen from T. Numata.  There is probable cause to believe that NUMATA used one or both of the cell phones to communicate under the fictitious name Jessica Martin to report the child pornography she attributed to T. Numata.  I know from the manufacturer's specifications that the Sony Ericsson Xperia, NTT Docomo brand, Model SO-01B, and the HTC AU brand with Google logo are smart phones with internet and email capability.  Based on the facts of this case, I believe there is probable cause that NUMATA used one or both of the smart phones to access the internet or send emails to communicate the bomb threat or distribute the child pornography.  There is also probable cause to believe, based on NUMATA's admission and the statement of Gonzalez, that NUMATA used the printer to print out the flyer containing images of child pornography.

27. Based on the label of the CD, "March 10, 2013 DV Incident," I believe there is probable cause that the CD contains evidence of a crime.  In my experience as a law enforcement officer, I know that "DV" is a common abbreviation for domestic violence.  Given that NUMATA and her husband were embroiled in a contentious divorce proceeding, I believe it likely that the CD contains evidence documenting a domestic violence incident during their marriage, which is relevant to her motive to engage in the child pornography and threat conduct.

28. Based on my experience and knowledge, I believe there is probable cause to believe that the digital camera may contain photos of the flyer bearing the child pornography images.  I believe this because the appearance of the poster on the Misawa Asks Facebook site appeared to have been scanned in or digitally uploaded.  There is no evidence that NUMATA utilized a scanner, therefore any of her digital devices capable of producing and transferring digital images are reasonable to consider as the source. In addition, the digital camera may contain photos documenting interactions between the NUMATA and her husband and child, which is relevant to NUMATA's motives in this case.

**Technical Terms**

29. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

   b. SIM Card is: A subscriber identity module or subscriber identification module (SIM) is an integrated circuit that securely stores the international mobile subscriber identity (IMSI) and the related key used to identify and authenticate subscribers on mobile telephony devices (such as mobile phones and computers).  A SIM circuit is embedded into a removable plastic card. This plastic card is called a "SIM card" and can be transferred between different mobile devices.

    c.      Digital Camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

    d.      iPad: An iPad is a brand of tablet. A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook computer, which is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets such as iPads typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving email, and participating in Internet social networks.

    e.      IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four sets of numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

    f.      Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

    g.      CD-RW: A CD-RW, a common abbreviation for Compact Disc-ReWritable, is a digital optical disc storage format. A CD-RW disc is a compact disc that can be written, read multiple times, erased, and written again.

30. Based on my training, experience, and research, I know that iPads and smart phones have the capability to access the internet, download and process photographs, and to transmit emails. Furthermore, I know that cellular phones contain call logs tracking incoming and outgoing calls. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

### Electronic Storage and Forensic Analysis

31. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

32. *Forensic evidence*. As further described in Attachment B, this application seeks

8

permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the devices were used, the purposes of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the devices because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a device is evidence may depend on other information stored on the device and the application of knowledge about how a device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

   e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

33. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

34. *Manner of execution*. Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## Conclusion

35. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the items described in Attachment A to seek the items described in Attachment B.

                                              Respectfully submitted,

                                              _____

                                              Zachary A. McCarter
                                              Special Agent
                                              United States Air Force
                                              Office of Special Investigations
                                              7th FIS, Joint Base Andrews, MD

Subscribed and sworn to before me this 23rd day of March 2015.

_____

The Honorable Alan Kay
United States Magistrate Judge

**ATTACHMENT A**

The property to be searched is:

- One (1) Sony Ericsson Xperia cellular phone with subscriber identification module (SIM) card enclosed, serial number CB511TNJV8;

- One (1) Apple iPad (black), serial number DMPMW9PCF4YF;

- One (1) Apple iPad (white), serial number DMPJN71TF187;

- One (1) Olympus digital camera with memory card, serial number UPQ015030;

- One (1) HTC AU provider cellular phone with SIM card, serial number SHTBC06190;

- One (1) Office Depot brand compact disc-rewritable (CD-RW) labeled "March 10, 2013 DV Incident";

- One (1) Brother Work Smart printer, serial number U63535G4F148160.

This warrant authorizes the forensic examination of the listed items for the purpose of identifying the electronically stored information described in Attachment B.

ATTACHMENT B

1.  All records on the items described in Attachment A that relate to violations of 18 U.S.C. § 844(e), § 875(c), and § 2252A(a)(2)(A) and (B), and involve NUMATA, since September 2014 (the approximate origin of NUMATA's marital disputes), including:

   a. Records indicating any contact with the Misawa Police Station, Misawa City International Center, and Misawa Air Base;
   b. Records evidencing the use of The Onion Router (TOR) website/software;
   c. Records evidencing the creation of Facebook accounts under assumed names, the access of the Misawa Asks Facebook site, access to the site Play Pen, FC2.com, or other websites involving child pornography;
   d. Records evidence access to the email of T. Numata after the theft of his iPad, including requests to change his email password;
   e. Records of Internet Protocol addresses used;
   f. Records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;
   g. Photographs or other documents depicting child pornography or relating to threats;
   h. Records evidencing prior allegations by NUMATA against T. Numata or other evidence of NUMATA's motives for falsely implicating T. Numata in criminal activity; and,
   i. Evidence concerning ownership of the devices or the identity of their user.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.